# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## NOTICE OF ENTRY OF
## JUDGMENT ACCOMPANIED BY OPINION

### OPINION FILED AND JUDGMENT ENTERED: 04/16/2013

The attached opinion announcing the judgment of the court in your case was filed and judgment was entered on the date indicated above. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing en banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Costs are taxed against the appellant in favor of the appellee under Rule 39. The party entitled to costs is provided a bill of costs form and an instruction sheet with this notice.

The parties are encouraged to stipulate to the costs. A bill of costs will be presumed correct in the absence of a timely filed objection.

Costs are payable to the party awarded costs. If costs are awarded to the government, they should be paid to the Treasurer of the United States. Where costs are awarded against the government, payment should be made to the person(s) designated under the governing statutes, the court's orders, and the parties' written settlement agreements. In cases between private parties, payment should be made to counsel for the party awarded costs or, if the party is not represented by counsel, to the party pro se. Payment of costs should not be sent to the court. Costs should be paid promptly.

If the court also imposed monetary sanctions, they are payable to the opposing party unless the court's opinion provides otherwise. Sanctions should be paid in the same way as costs.

Regarding exhibits and visual aids: Your attention is directed Fed. R. App. P. 34(g) which states that the clerk may destroy or dispose of the exhibits if counsel does not reclaim them within a reasonable time after the clerk gives notice to remove them. (The clerk deems a reasonable time to be 15 days from the date the final mandate is issued.)

FOR THE COURT

/s/ Jan Horbaly

Jan Horbaly
Clerk

Timothy C. Brightbill
Daniel Joseph Calhoun
Donald Cameron Jr.
Tessa V. Capeloto
Geert M. De Prest
Robert E. DeFrancesco III
Neil R. Ellis
Jeffrey Owen Frank
Jeffrey D. Gerrish
James C. Hecht
Mary Hodgins
Robert E. Lighthizer

Robert A. Lipstein
Diane A. MacDonald
Julie Mendoza
Brady Mills
Kevin Michael O'Brien
R. Will Planert
Loren Misha Preheim
Alan H. Price
Alexander Schaefer
Lori Scheetz
Ellen J. Schneider
Terence Patrick Stewart
Christine M. Streatfeild
Maureen E. Thorson
12-1248 - Union Steel v. US
United States Court of International Trade, No. 11-CV-0083, 11-CV-0084, 11-CV-0096

# United States Court of Appeals for the Federal Circuit

UNION STEEL, LG HAUSYS, LTD., LG HAUSYS
AMERICA, INC., AND DONGBU STEEL CO., LTD.,
*Plaintiffs-Appellants,*

v.

UNITED STATES,
*Defendant-Appellee,*

AND

NUCOR CORPORATION,
*Defendant-Appellee,*

AND

UNITED STATES STEEL CORPORATION,
*Defendant-Appellee.*

2012-1248, -1315

Appeal from the United States Court of International
Trade in No. 11-CV-0083, Judge Jane A. Restani.

Decided: April 16, 2013

DONALD B. CAMERON, Morris Manning & Martin LLP, Washington, DC, argued for plaintiffs-appellants. With him on the brief were JULIE C. MENDOZA, R. WILL PLANERT, BRADY W. MILLS, MARY S. HODGINS and JEFFREY O. FRANK.

L. MISHA PREHEIM, Trial Attorney, Civil Division, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for defendant-appellee, United States. With her on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and CLAUDIA BURKE, Assistant Director. Of counsel on the brief was DANIEL J. CALHOUN, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

TIMOTHY C. BRIGHTBILL, Wiley Rein LLP, of Washington, DC, argued for defendant-appellee, Nurcor Corporation. With him on the brief was ALAN H. PRICE. Of counsel were MAUREEN E. THORSON, LORI SCHEETZ, ROBERT E. DEFRANCESCO, III, and TESSA V. CAPELOTO.

JEFFREY D. GERRISH, Skadden, Arps, Slate, Meagher & Flom, LLP, of Washington, DC, argued for defendant-appellee, United States Steel Corporation. With him on the brief were ROBERT E. LIGHTHIZER and ELLEN J. SCHNEIDER.

NEIL R. ELLIS and JILL CAIAZZO, for amici curiae, Ami JTEKT Corporation, et al. and ROBERT A. LEPSTEIN and ALEXANDER H. SCHAEFER counsel for NSK Corporation, et al. and KEVIN M. O'BRIEN, DIANE A. MACDONALD and CHRISTINE M. STREATFIELD, counsel for NTN Corporation, et al.

UNION STEEL v. US                                                    3

TERENCE P. STEWART and GEERT DE PREST, Stewart and Stewart, of Washington, DC, for amicus curiae, Committee to support US Trade Laws.

---

Before LOURIE, PLAGER, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

In the decision now on appeal, the United States Court of International Trade affirmed the Department of Commerce's ("Commerce") use of zeroing to determine antidumping duties in administrative reviews, even though Commerce no longer uses zeroing in investigations establishing antidumping orders. This court has twice considered whether such divergent practices constitute a reasonable construction of Commerce's governing statute, both times remanding for Commerce to provide an explanation. In the case now on appeal, Commerce has provided such an explanation. Union Steel, LG Hausys, Ltd., LG Hausys America, Inc., and Dongbu Steel Co., Ltd. (collectively, "Appellants") appeal from the Court of International Trade's decision that, in light of this explanation, Commerce's zeroing practices are a reasonable interpretation of statute. *Union Steel v. United States,* 823 F. Supp. 2d 1346, 1360 (Ct. Int'l Trade 2012) (*"Union Steel"*). Because the Court of International Trade properly found that Commerce's interpretation of its governing statute is in accordance with law, we affirm.

## BACKGROUND

Dumping occurs when imported merchandise is sold for a lower price in the United States than it is sold in its home market. This practice can harm domestic producers who are selling the same goods at market value. *See Sioux Honey Ass'n v. Hartford Fire Ins. Co.,* 672 F.3d 1041, 1046 (Fed. Cir. 2012). The antidumping duty statute provides for the imposition of remedial duties to imported mer-

chandise sold, or likely to be sold, in the United States "at less than fair value" when the relevant domestic industry is harmed. 19 U.S.C. § 1673. "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'" *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677(35)(A)).

Commerce calculates a "dumping margin," which is "the amount by which the normal value exceeds the export price or constructed export price."[1] 19 U.S.C. § 1677(35)(A). Commerce relies upon three comparison methods to calculate dumping margins:

(1) Average-to-transaction, in which Commerce compares the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions.

(2) Average-to-average, in which Commerce compares the weighted average of the normal values to the weighted average of the export prices (or constructed export prices).

(3) Transaction-to-transaction, in which Commerce compares the normal value of an indi-

---

[1]    Commerce calculates a "weighted average dumping margin" by "dividing the aggregate dumping margins . . . by the aggregate export prices . . . of such exporter or producer." 19 U.S.C. § 1677(35)(B). Put simply, a "dumping margin" is a comparison of the normal value and the export price (or constructed export price), whereas a "weighted average dumping margin" is the aggregation of the results of those comparisons.

vidual transaction to the export price (or con-
structed export price) of an individual trans-
action.

*See* Statement of Administrative Action accompanying the
Uruguay Round Agreements Act, H.R. Doc. No. 103–316,
vol. 1, at 842–43, *reprinted in* 1994 U.S.C.C.A.N. 3773
("SAA").

Commerce calculates dumping margins both in inves-
tigations, which establish an antidumping order, and in
subsequent administrative reviews of that order. Follow-
ing an investigation, Commerce issues an antidumping
order which imposes a duty based upon the dumping
margin. *See* 19 U.S.C. §§ 1673a, 1673b(b), 1673b(d),
1673d(a), 1673d(c). Any exporter of the goods subject to
the antidumping order may annually request an adminis-
trative review to determine the exact amount by which
the foreign market value exceeds the U.S. price and
assess the precise amount of duties owed for their ex-
ports.[2] *See* 19 U.S.C. §§ 1675(a)(1), 1675(a)(2)(A).

As explained in the SAA accompanying the Uruguay
Round Agreements Act ("URAA") Commerce had a prac-
tice of using average-to-transaction comparisons to calcu-
late dumping margins in both investigations and
administrative reviews. SAA at 842. After adoption of the
URAA in 1995, Commerce switched to using average-to-
average or transaction-to-transaction comparisons in
antidumping duty investigations.[3] *Id.*; 19 U.S.C. § 1677f-

---

[2]    "Commerce uses [the] weighted-average dumping
margin to calculate the duties owed on an entry-by-entry
basis." *Timken Co. v. United States*, 354 F.3d 1334, 1338
(Fed. Cir. 2004).

[3]    The statute carves out an exception, however, al-
lowing Commerce to use average-to-transaction compari-
sons if "there is a pattern of export prices (or constructed
export prices) for comparable merchandise that differ

1(d)(1)(A). Commerce continued to use average-to-transaction comparisons as its general practice in administrative reviews.

In calculating the weighted average dumping margin, Commerce has historically used a methodology called "zeroing" where negative dumping margins (i.e., margins of sales of merchandise sold at nondumped prices) are given a value of zero and only positive dumping margins (i.e., margins for sales of merchandise sold at dumped prices) are aggregated. "That is, after [Commerce] computed an average dumping margin for each averaging group, if that averaging group . . . product did not have a positive dumping margin, Commerce set the margin at zero rather [than] at a negative number that would offset a positive margin for another averaging group."[4] *Union Steel*, 823 F. Supp. 2d at 1350. The applicable statute, 19 U.S.C. § 1677(35)(A), does not mention zeroing. However, as authority for this method, Commerce has emphasized the part of the statute stating that the dumping margin "means the amount by which the normal value *exceeds* the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A) (emphasis added).

This court has repeatedly addressed zeroing and has held 19 U.S.C. § 1677(35)(A) ambiguous and deferred to Commerce's reasonable interpretation of that statute. *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed.

significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B). This is generally referred to as "targeted" or "masked" dumping.

[4] In calculating weighted average dumping margins, Commerce creates an averaging group by grouping together sales of merchandise for purpose of price comparability based upon physical characteristics, referred to as "models," and assigns a control-number called "CONNUM". *See Union Steel*, 823 F. Supp. 2d at 1349.

Cir. 2004) (applying *Chevron* analysis to determine that
Commerce's practice of using zeroing in administrative
reviews was a reasonable interpretation of the statute);
*Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1347
(Fed. Cir. 2005) ("*Corus*") (extending *Timken* to encom-
pass Commerce's practice of zeroing in investigations).
Zeroing is controversial because some parties claim it
does not fully account for all of the comparable export
transactions, and so is not a "fair comparison" between
export price and normal value as required by Article 2.4
and 2.4.2 of the Anti-Dumping Agreement. *See* Panel
Report, *United States—Laws, Regulations and Methodol-
ogy for Calculating Dumping Margins ("Zeroing")*,
¶¶ 7.32, 7.33, WT/DS294/R (Oct. 31, 2005); *aff'd* Appellate
Report, *United States—Laws, Regulations and Methodol-
ogy for Calculating Dumping Margins ("Zeroing")*, ¶ 146,
WT/DS294/AB/R (Apr. 18, 2006); *see also Dongbu Steel
Co. v. United States*, 635 F.3d 1363, 1366 (Fed. Cir. 2011)
(characterizing zeroing as "controversial").

Commerce's use of zeroing with average-to-average
comparisons in certain antidumping duty investigations
was challenged by the European Communities before the
World Trade Organization's ("WTO") Dispute Settlement
Body. *See* Panel Report, ¶¶ 7.32, 7.33. The WTO found
Commerce's practice inconsistent with the United States'
international obligations, and Commerce determined that
it would cease using zeroing methodology in new and
pending investigations. *See Antidumping Proceedings:
Calculation of the Weighted-Average Dumping Margin
During an Antidumping Investigation; Final Modifica-
tion*, 71 Fed. Reg. 77,722 (Dec. 27, 2006). Instead, Com-
merce started using a method of "offsetting" to account for
sales made at less than fair value, such that some of the
dumping margins used to calculate a weighted average
dumping margin would be negative. *U.S. Steel*, 621 F.3d
at 1355.

In 2011, this court considered a challenge to Commerce's continuing use of zeroing in administrative reviews in an earlier review of the same antidumping duty order at issue in this case. In *Dongbu*, appellant Union Steel argued "that it is unreasonable to construe a single statutory provision [19 U.S.C. § 1677(35)] that applies to both investigations and administrative reviews as having opposite meanings depending on the nature of the antidumping proceeding." *Dongbu*, 635 F.3d at 1370. The court determined that "[a]lthough 19 U.S.C. § 1677(35) is ambiguous with respect to zeroing and Commerce plays an important role in resolving this gap in the statute, Commerce's discretion is not absolute. Commerce must provide an explanation for why the statutory language supports its inconsistent interpretation." *Id.* at 1372. The decision of the Court of International Trade was vacated and remanded for further proceedings "to give Commerce the opportunity to explain its reasoning." *Id.* at 1373.

Shortly thereafter, but before Commerce had the opportunity to provide an explanation, the court again addressed Commerce's practice of zeroing in administrative reviews but not in investigations in *JTEKT*, stating that Commerce

> failed to address the relevant question—why is it a reasonable interpretation of the statute to zero in administrative reviews, but not in investigations? It is not illuminating to the continued practice of zeroing to know that one phase uses average-to-average comparisons while the other uses average-to-transaction comparisons. In order to satisfy the requirement set out in *Dongbu*, Commerce must explain why these (or other) differences between the two phases make it reasonable to continue zeroing in one phase, but not the other.

*JTEKT Corp. v. United States*, 642 F.3d 1378, 1384–85 (Fed. Cir. 2011). Accordingly, the Court of International Trade's decision was vacated and the case was remanded "in order for Commerce to provide its reasoning." *Id.* at 1385.

Commerce's explanation is now before the court. At the Court of International Trade, Appellants challenged Commerce's application of zeroing methodology to the final results of the sixteenth administrative review for imports of certain corrosion-resistant carbon steel flat products from the Republic of Korea, the same antidumping duty order at issue in *Dongbu. Union Steel*, 823 F. Supp. 2d at 1347–48; *see Dongbu*, 635 F.3d at 1373. The United States sought a voluntary remand from the Court of International Trade in light of this court's decision in *JTEKT*, and the court granted the motion. J.A.96. On remand, Commerce discussed the inconsistent use of zeroing in administrative reviews and investigations, and explained why it believed its interpretation is reasonable, stating in summary:

> First [Commerce] has, with one limited exception, maintained a long-standing, judicially-affirmed interpretation of [19 U.S.C. § 1677(35)] pursuant to which [Commerce] does not consider export price to be a dumped price where normal value is less than export price. Pursuant to this interpretation, [Commerce] includes no (or zero) amount of dumping, rather than a negative amount of dumping, in calculating the aggregate weighted-average dumping margin where normal value is less than export price. Second, the limited exception to this interpretation was not adopted as an arbitrary departure from established practice, but was adopted, instead, in response to a specific international obligation the Executive Branch determined to implement pursuant to the procedures established by the [URAA] for such

changes in practice with full notice, comment and
explanation thereof. Third, [Commerce's] inter-
pretation reasonably resolves the ambiguity in [19
U.S.C. § 1677(35)] in a way that accounts for the
inherent differences between the result of an av-
erage-to-average comparison on the one hand and
the result of an average-to-transaction comparison
on the other.

*Results of Redetermination Pursuant to Remand* at 7 (Oct.
14, 2011) ("*Remand Results*").[5] The Court of Internation-
al Trade sustained Commerce's explanation, concluding
that Commerce "did not abuse its discretion in changing
its investigation methodology, but not its review method-
ology . . . in response to WTO decisions." *Union Steel*, 823
F. Supp. 2d at 1360. This appeal followed. We have
jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

---

[5]   It bears noting that Commerce has since revised
its methodology in administrative reviews using average-
to-average comparisons as the default method for calcu-
lating weighted average dumping margins. *See Anti-
dumping Proceedings: Calculation of the Weighted-
Average Dumping Margin and Assessment Rate in Certain
Antidumping Duty Proceedings; Final Modification*, 77
Fed. Reg. 8,101 (Feb. 14, 2012) (*Final Modification for
Reviews*). This change only applies prospectively. *Id.* As
part of the modification, Commerce indicated it would not
use the zeroing methodology, but instead would allow for
offsets when making average-to-average comparisons in
administrative reviews. *Id.* This modification does not
foreclose the possibility of using zeroing methodology
when Commerce employs a different comparison method
to address masked dumping concerns. *See id.*

## Discussion

While we recognize the Court of International Trade has unique and specialized expertise in trade law,[6] its decision is reviewed *de novo*, applying anew the same standard used by that court in its consideration of Commerce's determination. *Dongbu*, 635 F.3d at 1369. Accordingly, Commerce's antidumping determination will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). We apply a two-part inquiry to determine whether to sustain Commerce's statutory interpretation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). First, we determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If so, we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue," however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

The question here, as in *Dongbu* and *JTEKT*, is whether it is reasonable for Commerce to use zeroing in administrative reviews even though it no longer uses zeroing in investigations. *See Dongbu*, 635 F.3d at 1369;

---

[6]  "The expertise of the Court of International Trade . . . guides it in making complex determinations in a specialized area of the law. . . ." *United States v. Haggar Apparel Co.*, 526 U.S. 380, 394 (1999); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1321 (Fed. Cir. 2010) (*quoting Int'l Trading Co. v. United States*, 281 F.3d 1268, 1274) (Fed. Cir. 2002) ("the Court of International Trade 'has expertise in addressing antidumping issues and deals on a daily basis with the practical aspects of trade practice.'").

12                                    UNION STEEL v. US

*JTEKT*, 642 F.3d at 1384–85. Our analysis of the issue, however, is now aided by Commerce's explanation why the ambiguous statute, 19 U.S.C. § 1677(35), supports use of zeroing in administrative reviews and not in investigations. Thus, our task is now to determine whether Commerce's explanation of its zeroing practice is a reasonable interpretation of the statute.

Commerce's decision to modify its zeroing practice has previously been sustained by this court. In *U.S. Steel*, the court sustained Commerce's decision to cease zeroing when making average-to-average comparisons in antidumping duty investigations while recognizing Commerce intended to continue zeroing in other circumstances. *See U.S. Steel*, 621 F.3d at 1355 n.2, 1362–63. The court relied upon the differences among various types of comparison methodologies, recognizing that 19 U.S.C. § 1677f-1(d)(1) allows Commerce to use average-to-transaction comparisons in investigations where certain patterns of significant price differences exist. *Id.* at 1362. Additionally, the court sustained Commerce's decision to use zeroing methodology in an administrative review using average-to-transaction comparisons. *SKF USA Inc. v. United States*, 630 F.3d 1365, 1375 (Fed. Cir. 2011). In *SKF*, the court stated that "[e]ven after Commerce changed its policy with respect to original investigations, we have held that Commerce's application of zeroing to administrative reviews is not inconsistent with the statute." *Id.*

Contrary to Appellants' assertions, Commerce's reasonable interpretation of the statute is not foreclosed by this court's prior decisions.[7] In *Corus*, the court held that

---

    [7]    Amici JTEKT Corp., Koyo Corp. of U.S.A., NSK Ltd., NSK Corp., NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp., NTN-Bower Corp., and NTN Driveshaft, Inc., have forthrightly conceded as much, stating: "But the [c]ourt in *Donbgu* and

the statute was equally ambiguous for both administrative reviews and thus Commerce may use zeroing in both despite using different comparison methodologies in each. *Corus*, 395 F.3d at 1347. Although this court noted, in dicta, that "[i]t may be that Commerce cannot justify using opposite interpretations of 19 U.S.C. § 1677(35) in investigations and in administrative reviews," *Dongbu*, 635 F.3d at 1373, neither *Dongbu* nor *JTEKT* foreclosed the opportunity for Commerce to provide an explanation. Instead, both cases specifically requested that Commerce do so. *Id.*; *JTEKT*, 642 F.3d at 1384–85. Commerce's explanation now on review demonstrates that its varying interpretations are reasonable given the distinction between the comparison methodologies used in investigations and administrative reviews. Moreover, Commerce attributes the differing interpretations as necessary to comply with international obligations, while preserving a practice that serves recognized policy goals. Each of these analyses will be discussed in turn.

1.

Commerce justifies using zeroing in administrative reviews but not in investigations in part based on the different comparison methodologies used in each. Commerce explained in its *Remand Results* that average-to-average comparison methodology typically used in investigations is useful for examining an exporter's or manufacturer's overall pricing behavior. *Remand Results* at 13. Overall pricing behavior helps determine the appropriateness of imposing an antidumping duty order on a particular product. *Id.* With an antidumping duty order

---

*JTEKT* stopped well short of a categorical answer, instead affording [Commerce] an opportunity to further explain and justify its disparate interpretations." Amicus Br. in Support of Plaintiffs-Appellants and Reversal at 7–8.

already in place, administrative reviews typically use
average-to-transaction comparison methodology which
permits greater specificity to determine pricing behavior
for individual transactions. *Id.* The greater specificity
afforded through that methodology furthers the transac-
tional accuracy interests of administrative review. *Union
Steel*, 823 F. Supp. 2d at 1359. We agree with the Court
of International Trade's explanation that this distinction
is supported by statute: "Specificity is less important in
investigations in that [product group (CONNUM)] aver-
ages in investigations are not even monthly averages, as
they are in reviews. Rather, they are averages over a
broad time period compared to all other broad averages."
*Id.* (citing 19 U.S.C. § 1677f-1(d); 19 C.F.R.
§ 351.414(d)(3), (e)). However, "when it comes to setting
the final rates to be used for actual assessment, i.e., the
review rates, it is reasonable for the agency to look for
more accuracy, which it achieves in some measure
through monthly averaging, and also for the agency to
look for the full measure of duties resulting therefrom,
which it better achieves through zeroing." *Id.* The Court
of International Trade noted that "parties who are mar-
ginally dumping or not dumping may be excluded from
the order pursuant to the looser standards of the investi-
gation." *Id.* That is, in an investigation, margins of less
than two percent are treated as *de minimis*, resulting in a
party's exclusion from the order, while in an administra-
tive review, margins of 0.5 percent or less are treated as
*de minimis. Id.*

Commerce also explained that the average-to-average
methodology justifies the use of offsetting (i.e., not zero-
ing) for reasons inapplicable to average-to-transaction
comparisons. When using average-to-average compari-
sons, transactions are divided into "averaging groups."
*Remand Results* at 11. Transactions are divided into
averaging groups on the basis of physical characteristics
and level of trade for the purpose of price comparison. *Id.*

When calculating the average export price or constructed export price, Commerce calculates a comparison result for each averaging group, and averages together high and low export prices within the group. Thus, those export prices above normal value offset those below normal value within the averaging group. Commerce then aggregates the results of the comparison for each averaging group to calculate a weighted average dumping margin. *Id.* at 11–12. Accordingly, this comparison methodology masks individual transaction prices below normal value with other above normal value prices within the same averaging group.

In contrast, when Commerce uses the average-to-transaction comparison method, as it did in this administrative review, Commerce compares the export price (or constructed export price) for a particular export transaction with an average normal value for the comparable sales of foreign like products within the averaging group. *Id.* at 12. For specific export transactions, Commerce calculates a comparison result which establishes the amount that transaction is priced at less than its normal value. *Id.* Using this methodology, Commerce does not average export transaction prices before comparing the export price (or constructed export price) to normal value. Instead, Commerce uses a single export transaction price and aggregates the transaction-specific comparison result. The average-to-transaction comparison methodology thus reveals individual dumping.

Commerce's decision to use or not use the zeroing methodology reasonably reflects unique goals in differing comparison methodologies. In average-to-average comparisons, as used in investigations, Commerce examines average export prices; zeroing is not necessary because high prices offset low prices within each averaging group. When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping.

16                                          UNION STEEL v. US

This ensures the amount of antidumping duties assessed
better reflect the results of each average-to-transaction
comparison.[8]    Commerce's differing interpretation is
reasonable because the comparison methodologies com-
pute dumping margins in different ways and are used for
different reasons.

2.

Commerce also explained the methodology for investi-
gations was changed in response to an adverse WTO
decision through a section 123 proceeding.[9] In *Dongbu,*

---

[8]    The Court has previously recognized the purpose
of relying on average-to-transaction comparison method-
ology in administrative reviews:

The purpose of the antidumping statute is to pro-
tect domestic manufacturing against foreign
manufacturers who sell at less than fair market
value. Averaging U.S. prices defeats this purpose
by allowing foreign manufacturers to offset sales
made at less-than-fair value with higher priced
sales.    Commerce refers to this practice as
"masked dumping."    By using individual U.S.
prices in calculating dumping margins, Commerce
is able to identify a merchant who dumps the
product intermittently—sometimes selling below
the foreign market value and sometimes selling
above it. We cannot say that this is an unfair or
unreasonable result.

*Koyo Seiko Co., Ltd. v. United States,* 20 F.3d 1156, 1159
(Fed. Cir. 1994) (internal citations omitted).

[9]    Section 123 is the part of the URAA that laid out
the administrative procedure for response to adverse
WTO rulings. The U.S. Trade Representative consulted
public and private sector committees, and Commerce
provided for public comment before determining whether

the government raised this rationale at oral argument, and this court indicated that "the government's decision to implement an adverse WTO report standing alone does not provide sufficient justification for the inconsistent statutory interpretations." *Dongbu*, 635 F.3d at 1372. Nevertheless, it is within Commerce's discretion to adopt reasonable practices to meet international obligations. *Union Steel*, 823 F. Supp. 2d at 1357–58.[10] Certainly, this information is relevant when considered in conjunction with the other explanations offered by Commerce.

Section 123 establishes how an adverse WTO decision may be implemented in domestic law. *See* 19 U.S.C. §§ 3533; 3538. The WTO's decision was limited; it found that Commerce's use of zeroing methodology with respect to average-to-average comparisons in antidumping duty *investigations* was inconsistent with the United States's international obligations. Panel Report ¶ 7.106. The Executive Branch responded by discontinuing its zeroing practice in new and pending investigations using average-to-average comparison methodology. *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Duty Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dec. 27, 2006); *see U.S. Steel*, 621 F.3d at 1354–55. Commerce, did not, however, alter its practice with respect to the use of zeroing meth-

and how to change its practice. *See* 19 U.S.C. § 3533; *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Duty Investigation; Final Modification*, 71 Fed. Reg. 77,722 (Dec. 27, 2006).

[10]    This court sustained Commerce's decision to cease zeroing in average-to-average comparisons in investigations, while acknowledging that Commerce intended to continue to use zeroing in other types of comparisons methods. *U.S. Steel*, 621 F.3d at 1355 n.2 1362–63.

odology in anything other than investigations using average-to-average comparisons. "[T]here is no reason to assume that [Commerce's] only legal option is to expand the exception to apply in all contexts." *Remand Results* at 18. Commerce may reasonably decline to take any action beyond that which is necessary for it to come into compliance. *See ThyssenKrupp Acciai Speciali Terni S.p.A. v. United States*, 603 F.3d 928, 934 (Fed. Cir. 2010) (affirming Commerce's determination to only address that which was necessary to bring its determination into accordance with a WTO ruling). Commerce's modification was limited to changes that were necessary to comply with the WTO decision.

Citing *Clark v. Martinez*, 543 U.S. 371 (2005),[11] Appellants argue that it is unreasonable to construe a single statutory provision that applies in both investigations and administrative reviews as having different meanings depending on the type of antidumping proceeding. In *Clark*, the Supreme Court relied upon the rule of lenity to support a limiting construction of a statutory provision concerning detention of aliens subject to removal from the United States. *Clark*, 543 U.S. at 380–81. The Supreme Court applied traditional rules of statutory construction, and never considered *Chevron* deference in reaching its determination. *See Clark*, 543 U.S. 371. Here, the court has repeatedly held that 19 U.S.C. § 1677(35) is ambiguous and Commerce's explanation of its interpretation must be reasonable. *See Timken*, 354 F.3d at 1342; *Corus*, 395 F.3d at 1347; *U.S. Steel*, 621 F.3d at 1361. Thus, *Clark* is distinguishable here, where there is a conflict between two permissible interpretations simultaneously maintained.

---

[11] In *Clark*, the majority determined that a single statutory provision cannot be given different meanings when applied to different categories of aliens. *Clark*, 543 U.S. at 378.

No rule of law precludes Commerce from interpreting 19 U.S.C. § 1677(35) differently in different circumstances as long as it provides an adequate explanation. "[I]f the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).[12]

## CONCLUSION

For these reasons, the Court of International Trade's decision is affirmed.

## AFFIRMED

---

[12] Somewhat similarly, this court remanded a case for Commerce to provide an explanation of why interpreting the term "foreign like product" could be construed to mean different things in different parts of the antidumping statute. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382–83 (Fed. Cir. 2001). Following the remand, this court noted that 19 U.S.C. § 1677(16) contains three subsections providing three alternative definitions for the term "foreign like product" and that there was no restriction that Commerce use just one of those subsections per proceeding. *FAG Kugelfisher Georg Shaefer AG v. United States.* 332 F.3d 1370, 1373 (Fed. Cir. 2003). The court held that it was therefore reasonable for Commerce to apply the definition in one subsection for purposes of price-based calculations for normal value under 19 U.S.C. § 1677b(a)(1), while applying the definition in a different subsection for purposes of establishing constructed value under 19 U.S.C. § 1677b(e)(2)(A). *Id.* at 1373–74; *see SKF*, 263 F.3d at 1382–83.